**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MYRNA MIGLIACCIO, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BONAFIDE HEALTH, LLC

Defendant.

**Case No. 7:25-08954**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Myrna Migliaccio ("Plaintiff") brings this action on behalf of herself, and all others similarly situated (the "Class Members"), against Defendant Bonafide Health, LLC ("Defendant" or "Bonafide"). Plaintiff makes the following allegations pursuant to the investigation of her counsel, and based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF ACTION

1. This is a class action lawsuit brought on behalf of all California residents who completed the quiz or purchased a product through the website www.hellobonafide.com/ (the "Website") and whose electronic communications were intercepted or recorded by advertising technology provided by Attentive Mobile, Inc. ("Attentive") and Meta Platforms, Inc. ("Facebook" or "Meta") (collectively, the "Third Parties").

2. Bonafide is a pharmaceutical manufacturing company offering consumers access to "hormone-free, non-prescription solutions" to "safe, effective relief from menopause symptoms."[1] Defendant offers supplements through the Website which it owns and operates.

[1] Bonafide Health, *About us*, LINKEDIN, https://www.linkedin.com/company/bonafide-health-llc.

3.      Information related to menopause and menopausal symptoms is deeply sensitive and personal.  "Mental health changes — including unstable moods — are common in perimenopause. It's a normal event for half the world's population, and it can cause a lot of discomfort."[2]  Despite menopause being a normal event for women, "[t]he stigma surrounding menopause not only impacts women's wellbeing and quality of life, but also puts their long-term health at risk."[3]

4.      Consumers use Defendant's Website to seek treatment to improve their menopausal symptoms.  But what consumers don't know is that the intimate details about their symptoms and supplement purchases are not private—they are exploited by Defendant and the Third Parties.  Specifically, Defendant enables the Third Parties to contemporaneously capture Plaintiff's and class members' electronic communications with the Website as they seek menopausal supplements to abate their symptoms.

5.      The nature of the Third Parties' agreements with Defendant are such that Defendant "aids, agrees with, employs, or conspires" to permit the Third Parties to read, attempt to read, learn, and/or use the confidential communications of Website visitors without prior consent, thus violating the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631(a) and 632, and the California Constitution.

6.      Plaintiff brings this action for legal and equitable remedies resulting from Defendant's unlawful actions.

---

[2] Erin Digitale, *Mental health and menopause: There are connections and Solutions*, STANFORD MEDICINE NEWS CENTER, (May 16, 2024), https://med.stanford.edu/news/insights/2024/05/mental-health-menopause-perimenopause-solutions.html.

[3] Jody Tate, *The silence surrounding menopause is putting women's lives at risk*, THE HEALTH POLICY PARTNERSHIP, (June 1, 2023) https://www.healthpolicypartnership.com/the-silence-surrounding-menopause-is-putting-womens-lives-at-risk/.

**THE PARTIES**

7. Plaintiff is an adult citizen of the state of California, domiciled in Lemon Grove, California.

8. On or around September 30, 2024, Plaintiff purchased the product "Revaree" through the Website. Revaree is a product marketed and manufactured by Defendant for the specific purpose of providing relief for vaginal dryness. At that time, Plaintiff also completed the quiz on the Defendant's Website disclosing her symptoms, including vaginal dryness. Plaintiff purchased Revaree again on or around October 30, 2024, and December 29, 2024. When completing the quiz for personalized relief and purchasing supplements, Plaintiff reasonably expected the nature of her purchases and quiz answers, which included sensitive information about her symptoms and purchases, would be private and not disclosed to third parties. Defendant nonetheless assisted the Third Parties in intercepting Plaintiff's confidential communications.

9. Defendant Bonafide Health, Inc. is a New York corporation with its principal place of business in Harrison, New York. Defendant owns and operates the Website, which sells women's health products throughout the United States.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are at least 100 members of the proposed class, and Plaintiff, as well as all members of the proposed class, are citizens of different states than the Defendant.

11.     This Court has personal jurisdiction over Defendant because it is a New York corporation, headquartered in Westchester County, New York.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## FACTUAL ALLEGATIONS

### A.     Defendant Disclosed Sensitive, Private Information

13.     Defendant assisted Third Parties in intercepting information that was sensitive, private, and personally identifiable.

14.     Americans have an expectation of privacy when it concerns private information about health symptoms.  This is especially true when the disclosure of such information can reveal sensitive information about an individual's menopausal symptoms.

15.     Not only is this information confidential and sensitive, but it is also legally protected.  In 2020, California passed the California Privacy Rights Act, which expands the protections afforded by the California Consumer Privacy Act.  This includes expanding the term "sensitive personal information" to include "[p]ersonal information collected and analyzed concerning a consumer's health." Cal. Civ. Code § 1798.140(ae)(2)(B).

### B.     Background of the California Information Privacy Act ("CIPA")

16.     CIPA, Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

17. To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

18. Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (Reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

19. Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**C. Meta's Tracking Technologies**

20. Meta is one of the largest advertising companies in the country. To date, Meta generates nearly 98% of its revenue through advertising, [4] bringing in an excess of $160 billion in 2024.[5]

21. Meta's advertising business began back in 2007 with the creation of "Facebook Ads," which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads." [6]

22. Today, Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network. Facebook alone has more than 3 billion active users. [7]

23. Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level. "Among many possible target audiences, [Meta] offers advertisers," for example, "1.5 million people 'whose activity on Facebook

---

[4] Emmanuel Oyedegi, *Meta's ad business generated 98% of its total revenue in Q2 2025*, TECHLOY (Jul. 31, 2025) https://www.techloy.com/metas-ad-business-generated-98-percent-of-its-total-revenue-in-q2-2025/.

[5] Stacy Jo Dixon, *Meta's ad business generated 98% of its total revenue in Q2 2025*, STATISTA (Jan. 30, 2025) https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_uQ_https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_uQ_

[6] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

[7] Naveen Kumar, *Facebook Users Statistics (2025) – Latest Worldwide Data*, DEMANDSAGE (Aug. 19, 2015) https://www.demandsage.com/facebook-statistics/.

suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'" [8]

24. Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Meta's advertising services. Meta generates substantially all of its revenue from selling advertising placements:[9]

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

25. One of Meta's most powerful advertising tools is the Meta Pixel, formerly known as the Facebook Pixel, which launched in 2015 and its SDK.

26. Meta touted the Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."[10]

27. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activity as the users navigate through a website. As soon as a user takes any action on a

[8] Natasha Singer, *What You Don't Know About How Facebook Uses Your Data*, NEW YORK TIMES (Apr. 11, 2018) https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

[9] *Facebook Ad Revenue (2017–2027),* OBERLO, https://www.oberlo.com/statistics/facebook-ad-revenue.

[10] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

28. Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched. The Meta Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server, in some instances, for years on end.

29. This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits Defendant's Website, Meta receives third-party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

30. For example, Meta uses cookies named c_user, datr, fr and fbp to identify its account holders. Meta stores or updates Meta-specific cookies every time a person accesses their Facebook account from the same web browser.

31. The Meta Pixel can access these cookies and send certain identifying information like the user's Facebook ID to Facebook along with the other data relating to the user's website inputs.

32. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one – and only one – unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

33. A User's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the User, including pictures,

personal interests, work history, relationship status, and other details. Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the User's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

34. The Facebook datr cookie identifies the User's web browser. It is an identifier unique to each person's specific web browser and is another way Facebook can identify Facebook users.

35. The Facebook fr cookie is a combination of the Facebook ID (c_user) and the browser ID (datr) cookie values.

36. A user who accessed Defendant's Website while logged into (or recently having logged into) Facebook would have their browser transmit the c_user, datr and fr cookies to Facebook.

37. At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.

38. Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click, and view related to the shopping and products sought from Defendant).

39. Meta can also link the data to a specific user through the "Facebook Cookie." The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users, including Facebook users.

40.     Lastly, Meta can link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching."  There are two forms of Advanced Matching: manual matching and automatic matching.  Using Manual Advanced Matching the website developer manually sends data to Meta to link users.  Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.[11]

41.     Importantly, even if Meta Pixel collects data about a non-Facebook user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services.  These non-users are referred to as having "shadow profiles" with Meta.[12]

42.     At the time Plaintiff used Defendant's Website, she maintained an active social media account on Facebook.  Plaintiff accessed the Defendant's Website from the same device she used to visit Facebook, and Meta associated the data it collected about her from Defendant's Website with her Facebook account and other PII.

43.     Meta offers an analogous mobile version of the Meta Pixel known as an SDK to app developers. Meta's SDK allows app developers "to track events, such as a person installing your app or completing a purchase."  By tracking these events developers can measure ad performance and build audiences for ad targeting.[13]

44.     Meta's SDK collects three types of App Events.  Automatically Logged Events are "log[] app installs, app sessions, and in-app purchases."  Standard Events are "popular events

---

[11] While Meta purports to "hash" the PII provided by patients, Meta actually uses the hashed format *specifically to link the Meta Pixel data to Facebook profiles*.

[12] Jürgen Graf, *Investigating shadow profiles: The data of others*, TECHXPLORE (Sept. 22, 2023) https://techxplore.com/news/2023-09-shadow-profiles.html.

[13] *Meta App Event Tracking*, META, https://developers.facebook.com/docs/app-events/.

that Facebook has created for the app." Custom Events are "events [the app developers] create that are specific to [the] app."[14]

45. Once the data intercepted through the Meta Pixel or SDK is processed, Meta makes this data available through its Events Manager and Ads Manager pages, along with tools and analytics to reach these individuals through future Facebook ads. For instance, this data can be used to create "custom audiences" to target the user, as well as other Facebook users who match members of the audiences' criteria.[15]

46. In addition to using the data intercepted through Meta Pixel and SDK to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising network, and machine-learning algorithms, including by improving its ability to identify and target users.

47. Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its SDK given Meta's open systems and advanced algorithms.

48. According to leaked internal Meta documents, one employee explained "You pour that ink [i.e., data] into a lake of water . . . at it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?"[16]

---

[14] *Meta App Event Tracking: Overview*, META, https://developers.facebook.com/docs/app-events/.https://developers.facebook.com/docs/app-events/overview.

[15] *Audience Network*, META, https://developers.facebook.com/docs/app-events/overview.https://developers.facebook.com/docs/audience-network/.

[16] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document*, VICE, (Apr. 26, 2022) https://www.vice.com/en/article/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes/.

49.     In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'  And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation." [17]  Thus, once the data enters the Meta system, either through its SDK or Pixel, the data can be used for any and all purposes.

50.     Meta's own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used.  In a court hearing as part of the Cambridge Analytica scandal of 2018, Meta's own engineers testified there was not a "single person" at Meta who could answer that question.[18]

51.     At a minimum, Defendant uses the Meta Pixel and Advanced Matching Parameters on its Website.  As a result, Defendant disclosed and Meta intercepted Plaintiff's and consumers' interactions on the Website.  Meta received at least the consumers' menopausal supplement, proof of purchase, price, and SKU which it could associate with embedded cookies to associate the information with the consumer's identity.  Meta and Defendant used this data, as well as other data uploaded directly to Meta by Defendant, so that Defendant could run advertisements using its services.

---

[17] *Id.*

[18] Isober Asher Hamilton, *Senior Facebook engineers say no one at the company knows where your data is kept*, BUSINESS INSIDER, (Sept. 8. 2022) https://www.businessinsider.com/meta-doesnt-know-where-all-your-data-is-engineers-say-2022-9#:~:text=Two%20Meta%20engineers%20were%20grilled,there%20for%20almost%20nine%20years.

**D. Attentive's Tracking Technologies**

52. Attentive operates one of the largest marketing platforms in the country. "[O]ver 27% of the top 1,000 retailers in North America, including: 40% of the top apparel brands, 40% of the top jewelry brands, [and] 33% of the top health and beauty brands" utilize Attentive's marketing services.[19] Given Attentive's pervasiveness, the company has collected more than "1.8 billion email and phone numbers" and "1.4 trillion customer data points."[20]

53. To unlock the "full advantage" of its platform, Attentive requires retailers to integrate the "Attentive Tag" into their websites.[21] The Attentive Tag captures "behavioral data, page view, product view, add to cart, and purchase events."[22]

54. Through the Attentive Tag, Attentive "analyze[s] behaviors across the entire customer life cycle."[23] In exchange for that information, Attentive provides retailers with "a treasure trove of insights about [their] customers' shopping habits, like their browsing and purchasing history."[24]

---

[19] ATTENTIVE, RETAIL & E-COMMERCE, https://attentive.com/retail-ecommerce-marketing.
[20] ATTENTIVE, AUDIENCE MANAGER, https://www.attentive.com/audience-segmentation-manager.
[21] ATTENTIVE, THE ATTENTIVE TAG, https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag.
[22] *Id.*
[23] ATTENTIVE, ANALYTICS, https://www.attentive.com/sms-analytics-and-reporting.
[24] ATTENTIVE, HOW TO MAKE THE MOST OUT OF YOUR WEB TRAFFIC, https://www.attentive.com/blog/web-traffic-optimization.

55. Attentive collects and assimilates personal information into its "Identity Graph," which is "a web of data built with multiple unique identifiers (e.g. cookies, phone numbers, email, on-site shopping behavior, device information, first name, last name, etc.) with the customer at the center."[25] Through the Identity Graph, Attentive offers retailers "a comprehensive customer profile." *See* Fig. 1.

**Figure 1**

[25] ATTENTIVE, WHY ATTENTIVE SIGNAL IS THE KEY TO UNLOCKING TOP-PERFORMING CUSTOMER EXPERIENCES, https://www.attentive.com/blog/attentive-signal-faq.

56. These profiles show various data points, like a consumer's "activities," "preferences," "[f]avorite products," and "[d]evices." *See* Fig. 2.

**Figure 2**

57. Each profile also contains tabs for "Subscriptions," "Activities," "Attributes," and "Offers."[26] *See* Fig. 3.

**Figure 3**

58. The "Activities" tab reveals the content of the consumer's electronic communications.

---

[26] ATTENTIVE, VIEW SUBSCRIBER PROFILES, https://help.attentivemobile.com/hc/en-us/articles/4412398776724-View-subscriber-profiles.

59. To maintain its market share, Attentive constantly innovates to address "signal loss." Signal loss "refers to the diminishing strength of pixel fires on important signals or data points (such as purchase events), which were once reliably tied to campaigns and individual users."[27] To mitigate that loss, Attentive developed "Attentive Signals."

60. Attentive's Chief Strategy Officer, Eric Miao, best explains the innovation:

> Attentive Signal is our identity product. It's at the core of our platform. It powers everything you can do with it—from optimizing your customer segmentation strategy to triggering top-performing journeys. It collects and attributes a vast amount of shopper data directly to Attentive subscribers. This includes everything from zero-party data, like shopping preferences, to enrichment data, like device information.[28]

61. Put differently, "Attentive Signal is an identity solution that enables marketers to understand who's shopping on their site, identify specific habits, and build personalized experiences."[29] According to Attentive, it's so effective "that no matter where or how someone chooses to shop, all of their data can be linked back to their unique profile."[30] It's so effective, in other words, that Attentive can eliminate the "three key factors that contribute to signal loss": "evolving privacy requirements," "advanced ad-blockers," and "savvy customers."[31]

---

[27] Erik Koenig, *How To Overcome Signal Loss In Digital Marketing Campaigns*, FORBES, Jul. 19 2023), https://www.forbes.com/councils/forbesagencycouncil/2023/07/19/how-to-overcome-signal-loss-in-digital-marketing-campaigns/.

[28] ATTENTIVE, ATTENTIVE SIGNAL, https://www.attentive.com/signal-identity-solution.

[29] *Id.*

[30] ATTENTIVE, *supra* note 25.

[31] *Id.*

62.     Defendant knows that Attentive uses identifiers and online activity for its own commercial purposes.  Among other things, Attentive makes prominent representations on its website about how it leverages personal information to enhance its platform.  Attentive claims, for example, that it can send more triggered emails than its competitors because it "recognizes over 1 [billion] email addresses and phone numbers across devices."  *See* Fig. 4.



**Figure 4**

63.     Moreover, over the last two years, Attentive has incorporated artificial intelligence into several new products—"AI Journeys," "Audiences AI," and "Identity AI"—that were trained using the "1.4 trillion datapoints" in Attentive's possession.[32]  Since rolling out those products, Attentive has aggressively pitched them to existing customers, stating that their products will soon "help marketers deliver the sorts of truly 1:1 personalized experiences they have always dreamt of (and can deliver without any additional manual work)."[33]  Those pitches have paid off; as of December 2023, "80% of Attentive customers [were] using AI."[34]  Whether or not Defendant counts among that 80%, Defendant knows that Attentive created these products by, in part, leveraging personal information from customers who accessed Defendant's Website.

---

[32] ATTENTIVE, MEET ATTENTIVE AI™: AUTOMATED AND INTEGRATED ARTIFICIAL INTELLIGENCE, https://www.attentive.com/blog/attentive-ai.

[33] ATTENTIVE, *s,upra* note 25.

[34] *Attentive Drives Strong Momentum with 70% of Customers Now Using Its AI Solutions*, BUSINESS WIRE, (Dec. 13, 2023), https://www.businesswire.com/news/home/20231213790998/en/Attentive-Drives-Strong-Momentum-with-80-of-Customers-Now-Using-Its-AI-Solutions.

64.     Finally, for all retailers that use Attentive's platform, they must provide Attentive with a license to "copy, process and transmit the data, information and other materials transmitted to or through the Platform," including "Customer Data" like "telephone numbers" and "email addresses."[35]  That license also allows Attentive to use Customer Data "to provide and improve the Services."[36]  From that contract alone, Defendant knew that Attentive would use Customer Data to enhance its platform.

65.     At a minimum, Defendant uses the Attentive tracking technologies, including the Attentive Tag, on its Website.  As a result, Defendant disclosed and Attentive intercepted consumers'—including Plaintiff's—interactions on the Website.  Attentive received at least the consumers' menopausal supplement, proof of purchase, supplement price, consumer's name, and email address which it can associate with the consumer's identity.  Attentive and Defendant used this data, as well as other data uploaded directly to Attentive by Defendant, so that Defendant could run advertisements using its services.

**E.     Defendant Uses The Tracking Technologies To Violate The Privacy Rights Of Its Users**

66.     Defendant owns and operates the Website, which offers consumers access to a variety of menopausal supplements, as well as a quiz to help them determine what supplement will best abate their symptoms.

---

[35] ATTENTIVE, ATTENTIVE MASTER SUBSCRIPTION AGREEMENT, https://www.attentive.com/legal/msa.

[36] *Id.*

67.    Website visitors can elect to answer the quiz to guide them with their purchase via the "Take the Quiz" hyperlink, or they may navigate directly to the supplements page via the "Get Relief," "Shop," or "Bundles" buttons.  *See* Fig. 5.



**Figure 5**

68.    Unbeknownst to Plaintiff and Class Members, Defendant embedded Third Party Tracking Technologies into the Website—including but not limited to the Meta Pixel and Attentive Tag—for the purpose of capturing data and linking it to personally identifiable information.

69.     Take, for example, when a consumer elects to take the quiz.  They are prompted to enter personally identifiable information and sensitive symptom information, including their name, age range, symptoms, and email address.  *See* Fig. 6–9.



**Figure 6**



**Figure 7**



**Figure 8**



**Figure 9**

70.     At each stage of the quiz, the Meta Pixel received advanced matching parameters, and an encoded URL, containing the _fbp cookie and the FID.  *See* Fig. 10.



**Figure 10 (example of Meta Pixel Quiz interception)**

71. Defendant, through the Meta Pixel, shares customers'—including Plaintiff's—online activity. Each time a customer navigates through the quiz, Defendant discloses the _fbp and advanced matching parameter such that Meta can easily identify the individual using the Website.

72. Meta, at a minimum used the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles. Defendant sent these identifiers alongside the event data. Meta then leverages this information and sells it to third parties for targeted advertising purposes, as described above. *See supra* Sec. C.

73. Defendant assisted Meta with intercepting this information, including when it concerned information related to consumers' private sensitive information.

74. As with the Meta Pixel, when consumers access and navigate the Website quiz, Attentive's software script surreptitiously directs the user's browser to send a separate message to Attentive's servers. This second, secret transmission contains the original GET request sent to the Defendant's Website along with the additional data that Attentive's code is configured to collect. This transmission is initiated by Attentive's code and concurrent with the communications with the host website (i.e., Defendant's Website). Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Attentive's embedded code. *See* Fig. 11 (showing Attentive receives customers' name (redacted), symptoms, and the recommended products from the quiz).

**Figure 11 (example of Attentive Pixel Quiz interceptions)**

75. Each time a consumer progresses in the quiz, Defendant assists Attentive with contemporaneously receiving these identifiers.

76. Attentive also pairs those direct identifiers with event data, like "page views and purchases." By way of example, if a user clicks on "Painful sex," "Vaginal odor," and "Vaginal

infection" during the quiz, Attentive contemporaneously receives URLs containing that information.

77.     As shown in Figure 11 (above), Attentive obtains: the full URL string; the name of the product the quiz recommended; the symptoms the customer input into the quiz; and the first and last name of the customer.

78.     Attentive receives this event data and personally identifiable information from Defendant.

79.     Once received and processed by Attentive, Defendant knowingly uses the intercepted communications to run marketing campaigns that target consumers based on their activity on Defendant's website.

80.     Defendant does the same for all button clicks on the Website.

81.     Defendant further discloses Plaintiff's and customers' sensitive and personally identifiable information to Third Parties during the checkout process.

82.     Defendant's Website allows its customers to view menopausal supplements for purchase in four ways: through completing the symptoms quiz, or by clicking the: "Get Relief[,]" "Shop[,]" or "Bundles" buttons.  Irrespective of which method a customer uses to check out, Defendant discloses detailed information about customer purchases in the manner described below.

83.     When a consumer selects the product they wish to purchase, Defendant assists Meta, through the Meta Pixel, to receive a "ViewContent" event, wherein the product name, SKU, and price are disclosed, in addition to the customer's advanced matching information and _fbp, which can be used by Meta to identify who made the purchase.  *See e.g.* Fig. 12.



**Figure 12 (example of Meta Pixel interceptions)**

84.    On the final checkout page, Defendant further assists Third Parties with intercepting consumer data.

85.     On the checkout page, customers input their first and last name, email address, mailing address, and payment method.  *See* Fig. 13.



**Figure 13 (Example of Defendant's Checkout Page)**

86.     When a customer purchases a product, for example Clairvee, from Defendant's Website, Defendant assists Meta in intercepting a "Purchase" event which confirms there was a checkout, discloses the type of product purchased, and matches this to a consumer via, at a minimum, the _fbp and advanced matching parameters.  *See* Fig. 14.



**Figure 14 (Example Purchase Event Intercepted by Meta)**

87. Similar to the Meta Pixel, the Attentive Tag obtains: the customer's email; the name of the product purchased; the SKU number of the product purchased; the price of the product purchased; the order ID of the product; and the customer's user ID. *See* Fig. 15.

Query String Parameters view source view URL-encoded
v: 4.39.19_ad31a04c9f
pd: https://hellobonafide.com/checkouts/cn/aea7dd5829ae1f75bff4938a632f38f3/thank_you
u: 533ce13e32a6441988a7d50eee7071a3
ses: 21ad3e65fffb48e3b578721be20cde8f
c: bonafide
ceid: 4Yz
lt: 1744934500994
tag: modern
cs: 2226083798
t: p
r:
m: {"source":"spp","cartTotal":"60.00","email":"[redacted]2@yahoo.com","image":"https://cdn.shopify.com/s/files/1/0011/8590/6751/files/Bonafide_Clairvee_Account_B_922ede3b-e7d2-4a93-b303-705559a22f23.jpg?v=1707246204","name":"Clairvee","orderId":"6348524748863","uid":"8036760518719","cartCurrency":"USD","price":"55.00","quantity":"1","sku":6737533599807,"subProductId":39448818548799,"productId":6737533599807}
cb: 1744934501010
evs: [{"vendor":8,"id":"397272a9-FE92-4D21-B489-F4424E79759A"}]

**Figure 15 (Example Checkout Event Intercepted by Attentive)**

### F. Plaintiff and Consumers Do Not Consent To The Disclosure Of Their Information

88. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her confidential and sensitive personally identifiable information. Plaintiff was never provided with any notice that Defendant disclosed consumers' personally identifiable information and Website interactions (including symptoms and supplements purchased).

89. Throughout both the quiz and checkout process, Defendant never requested and Plaintiff never provided affirmative consent, through written, oral, or electronic means, to the collection and sale of her personally identifiable information.

90. Plaintiff similarly did not possess constructive notice of the privacy policy. Defendant's Website does not require users to affirmatively assent to the Defendant's privacy

policy. Further, to review the policy, users must scroll down to the bottom of the website's homepage and click on a link, without any way to consent.

91. Unbeknownst to Plaintiff and consumers, Defendant knowingly disclosed their sensitive and confidential personally identifiable information to Third Parties.

**i. Attentive Does Not Obtain Consent**

92. Plaintiff was unaware of who Attentive was, that Defendant employed Attentive's services—including but not limited to the Attentive Tag—or that Attentive was redirecting any information from the site.

93. Plaintiff could not have consented to Attentive obtaining her data. There was no direct interaction between Plaintiff and Attentive, and therefore no opportunity for affirmative consent, through written, oral, or electronic means.

94. Similarly, Plaintiff did not possess constructive notice of Attentive's use of her data. Plaintiff was unaware that Attentive's tracking code was implemented on the Website. The Website does not contain any disclosures about the relationship between Defendant and Attentive. No direct relationship existed between Plaintiff and Attentive. Because there was no relationship between Plaintiff and Attentive, and nothing on the Website could inform Plaintiff that Attentive would intercept Plaintiff's data, no constructive notice was given.

**ii. Facebook Does Not Obtain Consent**

95. Meta never received consent to intercept sensitive, protected information. In fact, Meta expressly warrants the opposite, promising to shield that information from disclosure.

96.     When first signing up, a user assents to three agreements: the Terms of Service,[37] the Cookies Policy,[38] and the Data Policy.[39]

97.     Meta's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[40]  The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[41]

98.     Meta's Data Policy recognizes that there may be"[d]ata with special protections," meaning information that "could be subject to special protections under the laws of your country."[42]  The Data Policy goes on to describe how Meta collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[43]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[44]

99.     Facebook then offers an express representation: "**We require each of these partners to have lawful rights to collect, use and share your data before providing any data**

---

[37] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[38] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[39] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

[40] FACEBOOK, *supra* note 37.

[41] *Id.*

[42] FACEBOOK, *supra* note 39.

[43] *Id.*

[44] *Id.*

**to us**."[45] Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[46]

100.    Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[47]

101.    Meta's other representations reinforce these warranties. In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[48] And in a blog post titled "About Restricted Meta Business Tools Data," Meta asserts it has "policies around the kinds of information businesses can share with us."[49] Meta does not "want websites or apps sending us sensitive information about people."[50] Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[51]

102.    These representations are repeated frequently. Meta created a "Help Center" to better explain its practices to users. In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against

---

[45] *Id.*

[46] *Id.*

[47] FACEBOOK, *supra* note 38.

[48] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.

[49] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://facebook.com/business/help/1057016521436966?id=188852726110565

[50] *Id.*

[51] *Id.*

that business or organization."[52]  In another article, titled, "How does Meta work with data providers?",  Meta repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[53]

103.    Based on these representations, Meta never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

**G.    Tolling**

104.    Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporation of the Facebook Tracking Pixel and tracking code from Attentive into its Website.

105.    The Facebook Tracking Pixel and Attentive tracking code were and are entirely invisible to Website visitors, including Plaintiff.

106.    Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

107.    Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

108.    Defendant had exclusive knowledge that its Website incorporated the Facebook Tracking Pixel and Attentive tracking code and yet failed to disclose to customers, including Plaintiff and Class Members, that by answering the quiz or purchasing products through the

---

[52] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://facebook.com/business/help/223050379265156.

[53] FACEBOOK, HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

Website, Plaintiff's and Class Members' sensitive, private information would be disclosed or released to Third Parties.

109. Under these circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of customers' sensitive, private information. In fact, to present, Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their sensitive, private information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

110. Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

111. The earliest that Plaintiff, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the Plaintiff's initial complaint in this matter.

## CLASS ACTION ALLEGATIONS

112. **Class Definition:** Plaintiff brings this action individually and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure. The Class Plaintiff seeks to represent is defined as: All individuals residing in California who made a purchase and/or completed the quiz on the Website, www.hellobonafide.com, during the Class Period.

113. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

114. Excluded from the proposed Class is Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

115. Plaintiff reserves the right to amend the definition of the Class and/or add subclasses if further information and discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

116. **Numerosity:** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are at least thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and third-parties Meta, and Attentive's records.

117. **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes. The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:.

(a) Whether Defendant's acts and practices violated CIPA § 631;

(b) Whether Defendant's acts and practices violated CIPA § 632;

(c) Whether Defendant's acts and practices violated the privacy rights of Plaintiff and members of the California Class under the California Constitution; and

(d) Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

118. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because Plaintiff, like all other Class Members, visited the Website and had her confidential electronic communications intercepted and disclosed to Third Parties.

119. **Adequacy:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Classes she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

120. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the Class, thereby

making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

**COUNT I**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT,**
**Cal. Penal Code § 631**

121. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

122. Plaintiff brings this Count individually and on behalf of the proposed Class.

123. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

124. A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

125. Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

126. To avoid liability under § 631(a), a defendant must show it had the consent of all parties to a communication.

127. At all relevant times, Defendant aided, agreed with, and conspired with Facebook and Attentive to track and intercept Plaintiff's and Class Members' internet communications while accessing www.hellobonafide.com. These communications were intercepted without the authorization and consent of Plaintiff and Class Members

128. Defendant, when aiding and assisting Facebook's and Attentive's wiretapping and eavesdropping, intended to help Facebook and Attentive learn some meaning of the content in the URLs and the content the visitor requested.

129. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Pixel and Attentive tracking code fall under the broad catch-all category of "any other manner":

(a) The computer codes and programs Facebook used to track Plaintiff and Class Members' communications while they were navigating www.hellobonafide.com;

(b) Plaintiff's and Class Members' browsers;

(c) Plaintiff's and Class Members' computing and mobile devices;

(d) Facebook's web and ad servers;

(e) Attentive's web and ad servers;

(f)     The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.hellobonafide.com;

(g)     The web and ad-servers from which Attentive tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.hellobonafide.com;

(h)     The computer codes and programs used by Facebook to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.hellobonafide.com;

(i)     The computer codes and programs used by Attentive to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.hellobonafide.com;

(j)     The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit www.hellobonafide.com; and

(k)     The plan Attentive carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit www.hellobonafide.com

130.    The information that Defendant transmitted using the Facebook Pixel and Attentive tracking code constituted sensitive and confidential personally identifiable information.

131.    As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to receive its customers' sensitive and confidential online communications through www.hellobonafide.com without their consent.

132. As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT II**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT,**
**Cal. Penal Code § 632**

133. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

134. Plaintiff brings this count individually and on behalf of the proposed Class.

135. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Pixel and Attentive tracking code fall under the broad catch-all category of "any other manner":

(a) The computer codes and programs Facebook used to track Plaintiff and Class Members' communications while they were navigating www.hellobonafide.com;

(b) Plaintiff's and Class Members' browsers;

(c) Plaintiff's and Class Members' computing and mobile devices;

(d) Facebook's web and ad servers;

(e) Attentive's web and ad servers;

(f) The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.hellobonafide.com;

(g) The web and ad-servers from which Attentive tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.hellobonafide.com;

(h) The computer codes and programs used by Facebook to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.hellobonafide.com;

(i) The computer codes and programs used by Attentive to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.hellobonafide.com;

(j) The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit www.hellobonafide.com; and

(k) The plan Attentive carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit www.hellobonafide.com

136. The data collected on Defendant's website constitutes "confidential communications," as that term is used in Section 632, because Class Members had objectively reasonable expectations of privacy with respect to their sensitive personal information.

137. Defendant is liable for aiding and abetting violations of Section 632 by the third-party vendors.

138. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT III**
**INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION/INTRUSION UPON SECLUSION**

139. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

140. Plaintiff brings this Count individually and on behalf of the proposed Class.

141. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

142. At all relevant times, by using the Facebook Pixel to record and communicate their FID's alongside their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

143. At all relevant times, by using the Attentive tracking code to record and communicate their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

144. Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential, and that Defendant would not install wiretaps on www.hellobonafide.com.

145. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive and confidential online communications.

146. The invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and confidential online communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

147. Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy/intrusion upon seclusion claims under California's Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action;

b. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e. For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief ordering Defendant to immediately cease its illegal conduct;

j. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

k. For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiff, on behalf of herself and the proposed Class, hereby demands a trial by jury on all claims so triable in this action.

Dated: October 28, 2025

Respectfully submitted,

By: */s/ Philip L. Fraietta*

**BURSOR & FISHER, P.A.**
Philip L. Fraietta
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: aleslie@bursor.com

*Counsel for Plaintiff*